ADAMS *v.* WHITTAKER.

4-7999                                    195 S. W. 2d 634

Opinion delivered June 26, 1946.

*Leffel Gentry,* for appellant.

*H. B. Stubblefield* and *Parker Parker,* for appellee.

SMITH, J. The question presented on this appeal is that of the constitutionality of Act 107 of the Acts of 1945, p. 253, entitled: "AN ACT Providing for Separate Primaries for the Selection of Candidates for Federal Offices, and for Other Purposes."

The Act in its entirety reads as follows:

"Section 1. Separate primaries, preferential and run-off, for the selection of candidates for federal offices, including those of United States Senators and Representatives, shall be held respectively on the third Tuesday in July and the first Tuesday in August preceding the general election, and they shall be governed by the primary election laws of the state as far as applicable. No citi-

zen shall be denied the right to vote in any primary election for the selection of federal offices on any ground prohibited by the Fifteenth Amendment to the Federal Constitution.

"Section 2. The costs of primary elections for the selection of candidates for federal offices shall be borne by the several counties in which the election is held.

"Section 3. This act is cumulative to Act 238 of 1943 and to all other existing laws governing primary elections not inconsistent with it, and it shall take effect and be in force from and after passage."

We are, of course, not concerned with the wisdom or policy of the legislation as this is a question solely for the General Assembly. We may consider only the power of the General Assembly to enact the legislation. In the case of *Eagle* v. *Beard*, 33 Ark. 497, Justice EAKIN said: "Comity towards a co-ordinate department of the government forbids the discussion of matters of discretion, when the power is conceded." The power to enact this statute exists unless in contravention of our own or the federal Constitution, and in passing upon that question every doubt must be resolved in favor of its validity.

The legislation is not an innovation in this state. Section 8 of art. III of the Constitution reads: "The general elections shall be held biennally on the first Monday of September, but the General Assembly may, by law, fix a different date." The elections, state and federal, were not consolidated until the adoption of Initiated Act No. 2, at the 1926 general election; thus for more than half a century these elections were separate.

In a recent issue of the Law School Bulletin of the University of Arkansas, there appears an article by the Dean of the Law School criticizing the act, but he does not express the opinion that the legislation is unconstitutional. The last sentence of § 1 of the act makes certain the fact that the act is not violative of the 15th Amendment to the federal constitution.

The decree from which is this appeal recites the reasons inducing the court below to hold the act uncon-

stitutional, one of these being that the act is so indefinite that its enforcement is not possible. Read by itself alone, this would be true, but not so when read in conjunction with legislation in force when it was passed, as the act expressly recites that it is cumulative to all other existing laws governing primary elections.

The first attempt to legalize primary elections in this state was made by the passage of Act CLIV, of the Acts of 1895, p. 240. By this act it was provided that primary elections might be made legal elections, if and when the county committees of the respective parties so ordered. By subsequent legislation, which we find it unnecessary to review, all primary elections are made legal elections. The present state of the law is that political parties are not required to hold primary elections to nominate candidates for office. They may do so or not, as the governing authorities of the parties may direct; but if a primary election is held, that election is a legal election, and must be held in conformity with the applicable laws of the state.

The petitions out of which this litigation arose were filed by two persons who are candidates for the Democratic nomination for Congress in the Fourth and Fifth Districts of the state respectively, and they allege invalidity of Act 107 and seek by mandamus to require the proper parties of the Democratic party to certify their names as candidates to be placed on the ballot, ignoring Act 107. They allege they have complied with all the laws of the state and the rules of the Democratic party which authorized them to become candidates for such nominations. They allege various reasons why Act 107 should be declared unconstitutional. In the decree of the court below awarding the relief prayed, there is an enumeration of the reasons inducing the court to declare Act 107 invalid and we consider them in their order.

First. That the act is void because of its indefiniteness. That objection has already been considered and disposed of.

Second. It violates § 1 of Amendment 14 to the Federal Constitution, in that it denies petitioners the equal

protection of the law. This objection may be answered by saying that Act 107 does not accord to any other person any right which is denied them.

Third. It violates § 18 of art. II, and § 2 of art. III, and § 28 of art. VII, and § 5 of art. XII of the Constitution of the State.

Section 18 of art. II provides that the General Assembly shall not grant to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens. It is not alleged by petitioners, or either of them, that any other person has been granted a right to become a candidate, at what we will call the Congressional primary, which has been denied them.

Section 2 of art. III provides that elections shall be free and equal, and that no power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage. It is not alleged in what respect this has been done, and we find nothing in the act which does so. On the contrary, this act, when read in connection with other acts on the subject, under which the Congressional Primary election will be held, manifests the purpose to make the election free and equal and to prevent fraud or other abuses in holding it.

Section 5 of art. XII prohibits any county, city, town or other municipality from appropriating any money for, or lending its credit to any corporation, association, institution or individual. Act 107 does not authorize such action. What it does do is to impose upon counties the expense of holding a legal election, and of this more will be said in another connection.

Section 28 of art. VII defines the jurisdiction of the county courts, and gives them jurisdiction of matters of "local concern" of their respective counties. There is nothing about this act involving the jurisdiction of the county court, except indeed to order the payment of the expenses of the election for which the act provides. In the case of *Little Rock* v. *N. Little Rock,* 72 Ark. 195, 79 S. W. 785, there was involved an act permitting the dismemberment of the city of Little Rock, pursuant to a pro-

ceeding under an act of the 1903 General Assembly, the validity of which was there attacked. Judge RIDDICK said: "It thus appears that the local concerns over which the county court is given exclusive jurisdiction are those which relate specially to county affairs, such as public roads, bridges, ferries and other matters of the kind mentioned in the section referred to and we do not think that the formation of towns and cities or the change of their boundaries is a local concern of which the county court has exclusive jurisdiction. This conclusion is, we think, sustained by the former decisions of this court."

Nor do we think the county court has been given jurisdiction to permit, or prohibit, the holding of an election which the General Assembly has said should be held.

Another objection to the act, and the one which has given us the most concern, is that provision imposing the expenses of the elections upon the counties in which they are to be held. It is alleged by one of the petitioners that only one county in his congressional district has made an appropriation to pay the expenses of the election, and it is alleged by the other petitioner that no county in his district has made such appropriation. It is argued that the congressional primary election cannot and will not be held because no provision is found in the act for the payment of the expenses of the election, except by the counties themselves, and that this is an expense which may not be imposed upon the counties.

The act does provide for the payment of the expenses of the election, its provision being that the counties shall pay the expense. Was it beyond the power of the General Assembly to so enact?

This question would be fraught with more difficulty than it is, but for the recent decision of the Supreme Court of the United States in the case of *Smith* v. *Allwright*, 321 U. S. 649, 64 S. Ct. 757, 88 L. Ed. 987, 151 A. L. R. 1110. However revolutionary this decision may be, it stands as the law of the land, and is, as binding upon

us as it is upon the state whose primary election law was there involved and invalidated.

The General Assembly of the State of Texas had passed what was called a presidential primary act which imposed the cost of the primary election there provided for upon the counties of the state. It was held by the Supreme Court of Texas in the case of *Waples* v. *Marrast,* 108 Tex. 5, 184 S. W. 180, L. R. A. 1917A, 253, that: "A primary election to select candidates of the various political parties for public office is not a public purpose for which taxes may be levied, or public funds expended." This was, of course, upon the theory that a party primary election was a private or party and not a public purpose.

Laboring under the same impression, this court in the case of *Robinson* v. *Holman,* 181 Ark. 428, 26 S. W. 2d 66, 70 A. L. R. 1488, held that a primary election was a private or party action, and that the party holding it had the right to say who might participate therein, and one of the reasons given for so holding was that the expenses were not paid by public funds, but by the party holding the election. Entertaining the opinion that the primary was private or party proposition, we said: "There is no more reason to say that the Democratic party in Arkansas cannot make the rule in question, (excluding negroes from the right to participate) than there is to say that the Masonic bodies in Arkansas may not exclude them on account of color." Certiorari was applied for, but was denied by the Supreme Court of the United States, 282 U. S. 804, 51 S. Ct. 88, 75 L. Ed. 722.

As pointed out by Prof. Leflar in his article above referred to, there can be no doubt that the case of *Smith* v. *Allwright, supra,* has overruled this case.

In this *Smith* v. *Allwright* case, the Supreme Court reviewed the laws of Texas relating to primary elections saying "despite Texas' decision that the exclusion (of the negro) is produced by private or party action" that the federal courts must appraise the facts leading to that conclusion.

The court's summary of the effect of the Texas primary election laws was as follows: "We think that this statutory system for the selection of party nominees for inclusion on the general election ballot makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election. The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party."

To reach this conclusion it was necessary, of course, to disregard the decision of the Supreme Court of Texas interpreting the primary election laws of that state, and also to overrule its own decision in the case of *Grovey* v. *Townsend*, 295 U. S. 45, 55 S. Ct. 622, 79 L. Ed. 1292, 97 A. L. R. 680, which it did in express terms.

At § 156, chapter entitled "Elections," 18 Am. Jur., 285 it is said: "It is a rule in some jurisdictions that a primary election to select candidates of the various political parties for public office is not a public purpose for which taxes may be levied or public revenues expended." The only case cited to sustain that text is that of *Waples* v. *Marrast,* which was in effect overruled by the *Smith* v. *Allwright* case, *supra*. And, inasmuch as that Texas case was predicated upon the proposition that the primary election was a private or party and not a public purpose, it cannot now be regarded as applicable here. But the text from which we have just quoted proceeds to say: "In other states, however, the view is taken that primaries are not the private affairs of the political parties, but constitute a part of the election machinery of the state, so that the payment of the expenses thereof by the state, or a political subdivision, does not constitute an expenditure of public money for other than a public purpose." Cases are cited in the note to sustain that view. See, also, 20 C. J. S. 1056.

We consider finally the objection that the congressional primary will not be held because the quorum courts have made no provision for the payment of the

expenses of the election. Several answers may be made to this objection, the first being that this failure, if true, does not affect the constitutionality of the act. But inasmuch as the power and duty of the courts to pay these expenses is involved, and is one of the reasons assigned for holding the act invalid, we proceed to decide that question.

In the first place, no specific appropriation by the quorum court is required to authorize the county to pay these expenses. The act has imposed this expense upon the counties and it will be their duty to discharge it.

In holding in the case of *Pearson v. State,* 56 Ark. 148, 19 S. W. 499, 35 Am. St. Rep. 91, that the legislature had the power to release a county treasurer from liability for school and county funds stolen by burglars, without fault on the treasurer's part, from a safe furnished him by the county, Judge HEMINGWAY said: "The power of the legislature to release a debt due to a municipality is of the same kind as its power to impose a debt on a municipality. It can do neither arbitrarily or capriciously, and must do either within the scope of a proper superintending control and trusteeship."

Opposing the view that such an expense may be imposed upon the county, we are cited the case of *State v. Craighead County,* 114 Ark. 278, 169 S. W. 964. In that case it was sought to require Craighead county to pay a bounty promised in consideration of the location of an agricultural school in that county. It was held that inasmuch as the school was a state institution, the burden of its erection and operation rested upon the state, and could not be imposed upon the county, inasmuch as the county could not be required to pay any part of the expenses of the state government. It may be noted that Chief Justice MCCULLOCH and Justice WOOD dissented from that holding. The case of *Cotham v. Coffman,* 111 Ark. 108, 163 S. W. 1183, involving the payment of a part of the salary of a circuit judge is to the same effect.

But the holding of an election in a county is a matter of vital concern to the citizens of the county, who other-

wise would be deprived of their right to participate in the election of their public officials. A county election is a public and a county purpose and a very important one, and if so the General Assembly has the power to impose its cost upon the county holding the election. Had the state seen proper to do so, it might have assumed the entire cost of the election. Indeed the primary election law of the State of Louisiana, § 2682.39, chapter, Election, La. General Statutes, apportions the cost of such elections between the state, parish and the towns of the state, and the candidates. If the right exists to assess any of the cost against the parish, or county, all costs might have been so assessed.

The cases of *Crawford County* v. *City of Van Buren,* 201 Ark. 798, 146 S. W. 2d 914, and *Jackson County* v. *Pickens,* 208 Ark. 15, 184 S. W. 2d 591, are decisive of the question. In each of these cases there was involved the question of the liability of the respective counties for the expenses of the municipal court, created by ordinances authorized by the laws of the state, which ordinances had in both instances been passed subsequent to the last prior meeting of the quorum courts of the respective counties. Consequently there was no appropriation for the payment of the portion of the expense of these courts imposed upon the counties. In the last of these cases, affirming the holding in the first one, that the counties were liable for and could be required to pay this expense, it was said: "There was therefore no discretion in the county court to allow or disallow the claims, funds being available for their payment, and it was not essential that there should have been a specific appropriation for their payment inasmuch as there was an unexpended balance of the appropriation for general county purposes sufficient to pay the claims." The holding in the case of *Polk County* v. *Mena Star Co.,* 175 Ark. 76, 298 S. W. 1002; and *Phillips County* v. *Arkansas State Pen.,* 156 Ark. 604, 247 S. W. 80, 248 S. W. 11, announced like principles.

But for the fact that it would protract and extend an opinion already too long, many acts of the General

Assembly might be cited which have imposed various duties upon the counties of the state, the expenses of which were to be paid by the counties.

Moreover, if an appropriation were required before the counties were liable for the expenses of the election, we must assume that a sufficient appropriation was made, for so it would have been if the quorum court in its sessions had followed the provision of § 2527 of Pope's Digest, which provides for the proceedings and order of business of these courts.

The sixth paragraph of this section taken from Act 301 of the Acts of 1909 (to which act reference was made in an opinion presently to be referred to), as amended by Act 112 of the Acts of 1937, provides the order in which, and the purpose for which appropriations may be made, and makes no specific reference to the expenses of holding elections of any kind. But the seventh paragraph of this section reads "to defray such other expenses of county government as are allowed by the laws of this state." This is in the nature of a "lest we forget" provision 'and covers any and all other expenses of the county government fixed by the laws of the state, and though no specific reference is made to elections, these expenses have always been paid and the obligation and power to pay them has never been questioned. Primary elections are legal elections and obligation to pay the expenses thereof has been imposed upon the counties by Act 107.

The case of *State, Use Prairie County*, v. *Leatham & Co.*, 170 Ark. 1004, 282 S. W. 367, involved the expense of an audit of the books and accounts of the county made pursuant to a contract with the county court. The right to pay was resisted upon the ground, among others, that no appropriation had been made to pay this expense. In holding that the claim should be paid notwithstanding that fact, Judge WOOD there said: "It is not necessary that a specific appropriation be made to defray the expense of auditing the books and accounts of officers of the county in order to justify the county court in entering into a contract for that purpose. This does not fall within

the category of objects for which special appropriations must be made, under the acts of May 31, 1909, § 2, p. 902, § 1982, C. and M. Digest, subdiv. sixth, (1-6). But it does come within the category of (7), to-wit: 'to defray other expenses of county government as are allowed by the laws of this state.' *Craig* v. *Grady,* 166 Ark. 344, 266 S. W. 267.''

It follows from what we have said that the act is constitutional and that the counties are liable for the expenses of the election. The decree of the court below will therefore be reversed and the cause dismissed.